UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
TRUSTEES OF THE LAUNDRY, DRY            :
CLEANING WORKERS AND ALLIED             :
INDUSTRIES HEALTH FUND, WORKERS         :
UNITED; TRUSTEES OF THE LAUNDRY,        :
DRY CLEANING WORKERS AND ALLIED         :
INDUSTRIES RETIREMENT FUND,             :
WORKERS UNITED; and TRUSTEES OF         :
THE LAUNDRY AND DRY CLEANING            :
WORKERS EDUCATION AND LEGAL             :
ASSISTANCE FUND,                        :
                    Plaintiffs,         :
v.                                      :
                                        :          **OPINION AND ORDER**
FDR SERVICES CORP. OF NEW YORK,         :
                    Defendant.          :          17 CV 7145 (VB)
--------------------------------------------------------------x
FDR SERVICES CORP. OF NEW YORK,         :
                    Third-Party Plaintiff, :
v.                                      :
                                        :
LAUNDRY, DISTRIBUTION, AND FOOD         :
SERVICE JOINT BOARD; and ALBERTO        :
ARROYO and WILFREDO LARANCUENT,         :
as Union Trustees of the Laundry, Dry Cleaning :
Workers and Allied Industries Health Fund,   :
Workers United and Officers of the Laundry,  :
Distribution and Food Service Joint Board,   :
                    Third-Party Defendants.  :
--------------------------------------------------------------x

Briccetti, J.:

        FDR Services Corp. of New York ("FDR") brings this third-party action against

defendants the Laundry, Distribution, and Food Service Joint Board (the "Union"); Alberto

Arroyo; and Wilfredo Larancuent (collectively, the "Union Defendants"), claiming the Union

Defendants failed to process waivers signed by FDR employees opting out of health insurance

coverage that would have reduced the amount of allegedly delinquent contributions for which

FDR is being sued in the main action brought pursuant to the Employee Retirement Income and Security Act of 1974 ("ERISA") by plaintiffs Trustees of the Laundry, Dry Cleaning Workers and Allied Industries Health Fund, Workers United (the "Health Fund"); Trustees of the Laundry, Dry Cleaning Workers and Allied Industries Retirement Fund, Workers United; and Trustees of the Laundry and Dry Cleaning Workers Education and Legal Assistance Fund (collectively, the "Funds").  In the main action, the Funds seek to compel FDR to submit to an audit and pay purportedly delinquent and outstanding contributions to the Funds.

Before the Court is FDR's motion to vacate an arbitration award dated February 1, 2023, issued by Arbitrator Hezekiah Brown, Esq. (the "Arbitrator"), denying FDR's third-party claims against the Union Defendants (Doc. #134), and a cross-motion by the Union Defendants to confirm the award.  (Doc. #137).

For the following reasons, FDR's motion to vacate is DENIED, and the Union Defendants' motion to confirm is GRANTED.

The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1367.

## BACKGROUND

The following factual background is drawn from the parties' submissions in support of and in opposition to the pending motions, as well as the third-party complaint (Doc. #62) and this Court's Memorandum Opinion and Order dated August 28, 2019.  (Doc. #91 (the "Order Compelling Arbitration")).

I.    FDR's Third-Party Claims

In the third-party complaint, FDR asserts claims against the Union Defendants for contribution and breach of fiduciary duties under ERISA and the common law.

2

FDR operated a commercial laundry facility in Paterson, New Jersey, from 2005 to 2016 and opened an additional facility in Hempstead, New York, in 2013.  The Union represented production workers and drivers employed at both facilities pursuant to a Collective Bargaining Agreement, effective from May 1, 2013, through April 30, 2016 (the "CBA"). Union Defendants Arroyo and Larancuent were Union representatives and trustees who would visit the facilities to address employee grievances and negotiate with FDR on behalf of covered employees.

In 2017, the Health Fund audited FDR's contributions under the CBA and determined FDR failed to remit approximately $300,000 of contributions for covered employees.  The Funds sued FDR pursuant to ERISA to collect it.

In the third-party complaint, FDR alleges the Union Defendants failed to forward to the Health Fund thirty-nine forms in which new hires waived Health Fund coverage.   Thus, FDR claims any failure to pay contributions for these thirty-nine individuals is the Union Defendants' fault because, if those waivers had been properly submitted, it would have relieved FDR of its obligation to contribute on these employees' behalf.  Accordingly, FDR contends the Union Defendants are liable for approximately $150,000 of the allegedly delinquent contributions.

II.     Motion to Compel Arbitration

On December 7, 2018, the Union Defendants moved to compel arbitration of, or in the alternative, to dismiss, the third-party complaint.  The Court granted the motion to compel and denied the motion to dismiss on August 28, 2019.

In the Order Compelling Arbitration, the Court summarized FDR's position opposing arbitration as follows:

> FDR argues the Union's alleged failure to forward signed employee waivers to the Health Fund breached a practice beyond the scope of the CBA—i.e., was not a breach of the CBA itself.  Further, according to FDR, the CBA provides only for FDR's obligation to make contributions to the Health Fund and does not address

the mechanics by which the Union and FDR ensured that the Health Fund received
the information necessary to enroll employees in the Fund.

(Order Compelling Arbitration at 5–6).  The Court concluded "FDR's interpretation of the

arbitration clause is too narrow," because "the parties dispute whether the CBA requires FDR to

contribute to the Health Fund on behalf of employees who waived coverage—a dispute that

explicitly calls for interpreting the CBA so as to define the scope of FDR's obligation to

contribute to the Health Fund."  (Id. at 6).

III.    Arbitration and Post-Arbitration Briefing

        The parties proceeded to arbitration.  Testimony was presented virtually during eleven

days of hearings between November 2020 and June 2022.

        After a hearing on January 28, 2021, the Arbitrator asked counsel for each side to define

the issue to be decided.  The Union, on February 25, 2021, framed the issue as follows:

> Did the Union breach the collective bargaining agreement by, from October 1, 2013
> through September 30, 2016, allegedly failing to enroll some of [FDR's] employees
> in the Health Fund and/or by allegedly failing to forward to the Health Fund signed
> employee waivers?

(Doc. #138 ("Swearengen Decl.") Ex. B at ECF 3).[1]  To decide that question, the Union asked

the Arbitrator to consider, among other things, whether FDR "proved that any waivers the Union

failed to send to the Health Fund would have reduced [FDR]'s obligation to contribute to the

Health Fund" and whether "Article 16(A) of the [CBA] require[d] [FDR] to make Health Fund

contributions on behalf of employees who waived coverage."  (Id. at ECF 4–5).  Article 16(A) of

the CBA provides:  "[T]he Employer agrees to contribute monthly to the [Heath Fund], or such

---

[1]      The parties' submissions in support of their cross-motions contain multiple duplicative
exhibits.   For those documents, the Court refers to the documents attached to the Swearengen
Declaration.

        "ECF __" refers to page numbers automatically assigned by the Court's Electronic Case
Filing system.

other fund as the Union may designate in writing, to prov[ide] coverage for Employees only."
(Swearengen Decl. Ex. A at 16).

FDR framed the issue differently.  According to FDR, only if the Arbitrator decides, as a
matter of fact, that the Union Defendants (i) had a past practice of transmitting employee waivers
to the Health Fund, and (ii) failed to transmit some of those waivers (among other findings of
fact), should he consider whether "such factual ruling or rulings lead to a legal conclusion that
the [Union Defendants] either:  1) breached the fiduciary duty that they owed; or 2) would be
liable for a portion of the deficiency sought by the Health Fund under a theory of contribution or
implied indemnification."  (Swearengen Decl. Ex. C at ECF 5).  In its submission, FDR noted
that "FDR's purported contractual obligations under the CBA may be a **defense** put forth by the
Union Defendants to argue that the Union did not have a fiduciary responsibility (because FDR
had a contractual one)" but was adamant that "FDR is **not** obligated to establish that the Union
breached a **contractual** obligation."  (Id. at ECF 6).

The Arbitration continued.  At the last hearing date on June 30, 2022, the Arbitrator
closed the case and ordered the parties to submit post-arbitration briefs by October 7, 2022.
(Doc. #135 ("Solomon Decl.") Ex. B at 1983).

In FDR's post-hearing brief, FDR framed the issue to be decided as:  "Did the [Union]
(via its representatives and/or shop stewards) fail to submit enrollment and/or waiver forms to
health fund?"  (Solomon Decl. Ex. C at 1).  FDR argued the Order Compelling Arbitration
"states that this is the only issue to be decided in this Arbitration."  (Id.)  Moreover, according to
FDR, the CBA was unambiguous, and FDR's "only obligation under the [CBA] was to pay all
invoices submitted by the health fund (which FDR complied with)."  (Id. at 1–2).

Conversely, the Union Defendants argued Article 16(A) of the CBA clearly and unambiguously required FDR to contribute to the Health Fund on behalf of all covered employees.   The CBA, according to the Union Defendants, did not exclude employees who have other insurance coverage or "who, through oversight or otherwise, are not actually enrolled in the Health Fund and are not actually receiving benefits under the Health Fund."  (Swearengen Decl. Ex. E at 2–3, 25).  Thus, the Arbitrator need not consider whether the Union Defendants failed to transmit waiver forms because FDR was required to contribute on behalf of all employees— including those who purportedly signed waivers.  However, if the Arbitrator did reach that question, the Union Defendants argued FDR had failed to establish there was actually a past practice of Union representatives transmitting enrollment and waiver forms to the Health Fund.

IV.   The Draft Award

On November 26, 2022, the Arbitrator emailed counsel for both parties regarding an overpayment received by the Arbitrator with respect to an invoice for his fees.  Apparently, the Arbitrator mistakenly attached to his email a draft of his opinion and award in the Arbitration (the "Draft Award").  The Draft Award is evidently a rough, incomplete draft, and includes pages with large blank spaces.  (See, e.g., Swearengen Decl. Ex. F at ECF 5, 8).  The Draft Award identified the issue to be decided as:

> Did FDR violate the Collective Bargaining Agreement when it failed or refused to pay for employees who had signed waivers to opt out of the Health Fund or was insured through Medicaid or other government Plan?

(Id. at ECF 4).  Concluding FDR's grievance must be denied, the Draft Award found that "FDR failed to present sufficient clear and convincing evidence to prove that [the Union] was responsible in any manner for collecting and delivering health insurance forms to the insurance carrier."  (Id. at ECF 8).  In support of this conclusion, the Draft Award reasons:

> The contract language [in Article 16(A)] is clear and unambiguous in regards to payment of insurance on behalf of employees. . . . [T]he only reference to a lower rate or waiver was directed to an overall reduction in payment through the NY Master Collective Bargaining Agreement. . . . I was convinced that, the language of the Collective Bargaining Agreement was silent in dealing with the issue of employees being able to opt out of the plan.

(Id. at ECF 10–12). Moreover, the Draft Award stated: "[A]nything that's not covered by the collective bargaining Agreement becomes a management right. In this case, [FDR] management . . . permitted [the shop steward] to perform these task[s] of signing-up new hires for benefit" which FDR was entitled to do "[s]ince [the shop steward] was employed and paid by FDR." (Id. at ECF 12).

V.      Letters Addressing the Draft Award

On November 29, 2022, counsel for the Union Defendants responded to the Arbitrator's email and attached a three-page letter (the "Union Letter"). In the letter, counsel stated she wished to "correct several misstatements of fact that appear in" the Draft Award. (Swearengen Decl. Ex. G at ECF 3). She explained that this Court, in the Order Compelling Arbitration, directed the Arbitrator to decide "FDR's claims against the Union – namely, that the Union's alleged failure to forward signed employee waivers to the Health Fund breached a practice." (Id. at ECF 3–4). She also corrected a statement in the Draft Award that the Health Fund's third-party administrator presented evidence showing employees had opted out of the health plan (because, counsel claimed, the Health Fund was not aware of the contested waivers before FDR's third-party action).

The Union Defendants' counsel felt it was important to "correct" these facts because the issue, as framed in the Draft Award, "is not the issue that Judge Briccetti asked [the Arbitrator] to decide," which was, quoting from the Order Compelling Arbitration, "FDR's claims against the Union defendants." (Swearengen Decl. Ex. G at ECF 3, 4). Conversely, the issue as framed

in the Draft Award "would essentially require [the Arbitrator] to issue an award as to the merits

of the Health Fund's federal claims against FDR," a matter reserved for the Court to decide in

the underlying ERISA action.  (Id. at ECF 5).

On December 7, 2022, FDR's counsel also responded to the Arbitrator's email, attaching

a one-page letter (the "FDR Letter") arguing the Union Letter was an improper sur-reply to the

post-arbitration briefing.  However, counsel noted:

> It is also FDR's understanding that the Draft Award is subject to revision and that
> Your Honor will give due consideration to FDR's post-arbitration brief, which
> explained that the only issue to be decided is:  **Did the Union (via its
> representatives and/or shop stewards) fail to submit enrollment and/or waiver
> forms to health fund?**

(Swearengen Decl. Ex. H at ECF 4).

VI.    The Final Award

On February 1, 2023, the Arbitrator issued a final opinion and award.  (Swearengen Decl.

Ex. I (the "Final Award")).  The Final Award frames the issue decided as "Whether employees

are covered by the CBA and therefore entitled to contributions?" (Final Award at 2).

The Final Award answers this question in the affirmative, ruling in the Union

Defendants' favor and holding "FDR failed to present sufficient clear and convincing evidence

to prove that the 39 employees and others who signed waivers opting out of the health plan were

exempt due to an alleged past practice."  (Final Award at 33).

In so concluding, the Arbitrator referred to the "clear and unambiguous" language in

Article 16(A) of the CBA "regard[ing] the payment of insurance on behalf of employees" and

noted the absence of any waiver or exemption for individual employees.  (Final Award at 35).

Moreover, the Arbitrator found "FDR did not present any credible evidence confirming that it

was authorized to stop payment for employees who signed waivers opting out of the health

plan."  (Id. at 38).  Thus, the Arbitrator decided all employees, even those who purportedly

signed waivers, were covered by the CBA and that FDR owed Health Fund contributions on their behalf.

As to FDR's arguments about breaching a past practice, the Arbitrator noted that "it very well could have been the duties of the Shop Steward to collect and deliver the benefit forms to the Insurance carrier." (Final Award at 36). However, FDR's status as the shop steward's employer rendered it responsible "for her error in judgment in failing to process the health insurance enrollment forms" because "it was FDR's responsibility to determine the duties and activities of their employees." (Id.). Moreover, the Arbitrator concluded "FDR did not present any credible evidence that" the Union authorized the shop steward to perform this function, and the CBA prohibited any individual Union member to take any actions governed by the CBA without the Union's consent. (Id. at 37). Therefore, the Arbitrator "believe[d] that [FDR] had some influence over [the shop steward's] decision to withhold the thirty-nine enrollment forms which were contrary to the language of the" CBA. (Id. at 36). The Final Award includes language similar to that in the Draft Award that "issues that are not covered by the collective bargaining Agreement become a management right" and that FDR exercised that right by "permit[ing] [the shop steward] to perform the task of signing-up new hires for benefits." (Id. at 37–38).

## DISCUSSION

### I.   Standard of Review

This Court's grant of authority to review arbitration awards is limited. The Federal Arbitration Act permits vacatur of an arbitration award under four narrow circumstances:

> (1) where the award was procured by corruption, fraud, or undue means; (2) where there was evident partiality or corruption in the arbitrators, or either of them; (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and

material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a).  "In addition, as judicial gloss on these specific grounds for vacatur of arbitration awards, . . . the court may set aside an arbitration award if it was rendered in manifest disregard of the law."  Schwartz v. Merrill Lynch & Co., 665 F.3d 444, 451 (2d Cir. 2011).[2]

Such circumscribed review ensures that the "twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation," are fulfilled.  Folkways Music Publishers v. Weiss, 989 F.2d 108, 111 (2d Cir. 1993).  Thus, the party seeking to vacate an arbitration award bears a high burden to avoid summary confirmation.  D.H. Blair & Co. v. Gottdiener, 462 F.3d 95, 110 (2d Cir. 2006).

Under this highly deferential standard, the Second Circuit has held that an arbitration award must be upheld when "the arbitrator offers even a barely colorable justification for the outcome reached."  Wackenhut Corp. v. Amalgamated Local 515, 126 F.3d 29, 31–32 (2d Cir. 1997).  In the end, "[t]he contractual theory of arbitration . . . requires a reviewing court to affirm an award it views as incorrect—even very incorrect—so long as the decision is plausibly grounded in the parties' agreement."  Id. at 32.  "[A] federal court's review of labor arbitration awards" in particular "is narrowly circumscribed and highly deferential—indeed, among the most deferential in the law."  Nat'l Football League Mgmt. Council v. Nat'l Football League Players Ass'n, 820 F.3d 527, 532 (2d Cir. 2016).

---

[2]     Unless otherwise indicated, case quotations omit all internal citations, quotation marks, footnotes, and alterations.

"To justify vacatur on the grounds of fraud or undue means, it must be 'abundantly clear' that the award was procured through improper means." ACP Inv. Grp., LLC v. Blake, 2016 WL 5947290, at *4 (S.D.N.Y. Oct. 13, 2016) (quoting Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Tr., 729 F.3d 99, 105 (2d Cir. 2013)).

Likewise, to justify vacatur due to an arbitrator's misconduct, the movant must "not only . . . demonstrate clear evidence of impropriety, but also establish actual prejudice." Nat'l Hockey League Players Ass'n v. Bettman, 1994 WL 738835, at *24 (S.D.N.Y. Nov. 9, 1994); see also Rai v. Barclays Cap. Inc., 739 F. Supp. 2d 364, 372 (S.D.N.Y. 2010) ("Vacatur is only permitted where the arbitrator's" misconduct "prejudices one of the parties."), aff'd, 456 F. App'x 8 (2d Cir. 2011). "[M]isconduct occurs under this provision only where there is a denial of fundamental fairness." Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Tr., 729 F.3d at 105. For this reason, although violation of arbitration association rules "can, under certain circumstances, require vacatur of an arbitration award," Circle Indus. USA, Inc. v. Parke Constr. Grp., Inc., 183 F.3d 105, 109 (2d Cir. 1999), procedural violations that do not rise to misconduct or result in prejudice "are not sufficient of themselves to vacate an award." N.Y. Newspaper Printing Pressman's Union No. 2 v. N.Y. Times Co., 1992 WL 122788, at *7 (S.D.N.Y. May 22, 1992).

To demonstrate an arbitrator exceeded her authority warranting vacatur, the challenging party must establish the arbitrator did not have power, "based on the parties' submissions or the arbitration agreement, to reach a certain issue, not whether the arbitrator[] correctly decided that issue." Jock v. Sterling Jewelers Inc., 646 F.3d 113, 122 (2d Cir. 2011). "[A]n arbitrator may exceed her authority by, first, considering issues beyond those the parties have submitted for her consideration, or, second, reaching issues clearly prohibited by law or by the terms of the parties'

11

agreement." Id. "[C]ourts in this and other circuits have exhibited considerable deference toward arbitrators' determinations regarding the scope of their own authority." N.Y. State Fed'n of Physicians & Dentists v. Interfaith Med. Ctr., 2007 WL 2743708, at *3 (E.D.N.Y. Sept. 21, 2007) (collecting cases). In addition, "the Second Circuit has counseled against reading arbitration submissions [of the issue to be arbitrated] narrowly." Id. at *4.

If the parties have consented to confirmation of an arbitration award by a court, a party may petition a court for an order confirming the award within one year after the award is made. 9 U.S.C. § 9. "[T]he court must grant such an order unless the award is vacated, modified, or corrected." Id. Here, the CBA provides that "[j]udgment upon [an arbitration] award may be entered, and enforcement may be sought in, any court of competent jurisdiction." (Swearengen Decl. Ex. A at 22).

II.     The Union Letter

FDR argues the Final Award should be vacated because the Arbitrator was improperly influenced by the post-Draft Award Union Letter.

The Court disagrees.

This argument arguably touches two bases for vacatur: First, the Final Award was procured by "undue means," 9 U.S.C. § 10(a)(1); and second, the Arbitrator engaged in misbehavior prejudicing the rights of FDR. Id. § 10(a)(3). Neither argument surmounts the high burden to justify vacatur, and thus neither argument has merit.

As an initial matter, the Union Letter is not, as FDR argues, akin to an improper ex parte communication, because it was simultaneously sent to the Arbitrator and counsel for FDR. In fact, the Union Letter invited FDR's counsel to reply, which FDR's counsel did. (See Swearengen Decl. Ex. G at ECF 3 ("I am copying [FDR's counsel] on this response, as he may

wish to submit a response of his own.")).  But even lending credit to FDR's position, FDR has

failed to prove the Union Letter "deprived [FDR] of a fair hearing and influenced the outcome of

the arbitration."  Glob. Gold Min. LLC v. Caldera Res., Inc., 941 F. Supp. 2d 372, 386 (S.D.N.Y.

2013).

      First, FDR was given every opportunity to argue its case, as well as multiple specific

opportunities to clearly frame the issue it wanted the Arbitrator to decide.  See Wenchun Zheng

v. Gen. Elec. Co., 2018 WL 8732194, at *7 (N.D.N.Y. Mar. 12, 2018) (arbitrator did not engage

in misconduct prejudicing plaintiff when plaintiff "fully participated in the briefing process,

there is no evidence that the arbitrator refused to hear evidence pertinent and material to the

controversy," and plaintiff merely argued the arbitrator disagreed with the movant's arguments).

And, as already noted, FDR had an opportunity to, and did, respond to the Union Letter.  See

Nat'l Hockey League Players Ass'n v. Bettman, 1994 WL 738835, at *26 ("[I]f the arbitrator has

had separate contacts with both sides to the controversy . . . no disqualification is justified.").

      Second, FDR has not shown the Arbitrator actually modified the Draft Award based on

the Union Letter.  The Draft Award is perceptibly incomplete, but based on what was written,

critical portions analyzing the CBA and the alleged past practice were substantially unchanged in

the Final Award.  Although the Final Award is different from the Draft Award, it does not, as

FDR claims, adopt wholesale the Union Letter's description of the underlying ERISA litigation

or its framing of the issue to be decided.  Furthermore, an examination of the February 25, 2021,

issue statements and the post-arbitration briefing submitted by each party shows the Union Letter

did not offer any information that had not already been presented to the Arbitrator.  See Nat'l

Hockey League Players Ass'n v. Bettman, 1994 WL 738835, at *26  ("[T]he decisions that have

voided an arbitrator's award based on ex parte contacts have typically involved a . . . scenario, in

which the arbitrator obtains evidence from one party, without notice to the other parties, and then relies on that evidence in reaching his decision.").

Even if the Arbitrator was motivated to change the Final Award based on the Union Letter, FDR has failed to show these modifications prejudiced FDR.  Critically, both the Draft Award and the Final Award ruled in favor of the Union Defendants and did so on the same basis—that the clear language of the CBA required FDR to contribute to the Health Fund on behalf of employees who signed waivers opting out of coverage, and that any practice of the shop steward forwarding Health Fund forms on behalf of employees was under the control of FDR.

For these reasons, the Court discerns neither Arbitrator misconduct nor prejudice to FDR from the Union Letter.  Consequently, even if consideration of the Union Letter violated applicable arbitration rules, as FDR contends, this violation would not support vacatur.

Accordingly, the Court declines to vacate the Final Award based on the Union Letter.

III.   <u>Incorrect Issue Decided</u>

FDR also argues the Final Award should be vacated because the Arbitrator decided the wrong issue, thereby exceeding his authority and failing to render a mutual, final, and definite award.

The Court disagrees.

Importantly, this Court already decided that the issue, as stated by the Arbitrator in the Final Award, falls squarely within the arbitration clause in the CBA, and therefore, the Arbitrator's power to decide it.  (<u>See</u> Order Compelling Arbitration at 6 ("[T]he parties dispute whether the CBA requires FDR to contribute to the Health Fund on behalf of employees who waived coverage—a dispute that explicitly calls for interpreting the CBA so as to define the

14

scope of FDR's obligation to contribute to the Health Fund.")).  Hence, FDR's argument that the Arbitrator "ignored the issue identified by the Court" to be arbitrated is patently false.  (FDR Mem. at 11).

Regardless, it is clear the Final Award did not exceed the Arbitrator's authority.  The real substance of the dispute to be arbitrated was whether the Union Defendants bore some liability for FDR's delinquency because the Union Defendants purportedly failed to forward certain Health Fund waivers.  That the Arbitrator concluded these employees were covered by the CBA, instead of FDR's desired holding that Union representatives did not pass along the contested waivers, does not indicate he exceeded his authority.  Rather, the Final Award's holding nullifies the relevance of FDR's question and is dispositive of FDR's third-party claims:  the Union Defendants did not breach a duty or contribute to FDR's delinquency because any successful transfer of waiver forms would not have reduced FDR's liability in the Funds' ERISA action.  See N.Y. State Fed'n of Physicians & Dentists v. Interfaith Med. Ctr., 2007 WL 2743708, at *4 (declining to vacate when the arbitrator adopted a "broad reading" of the issue but "not an unreasonable one, and it by no means transgresse[d] any specific limitation on the arbitrator's jurisdiction").

Finally, the Arbitrator did address FDR's arguments regarding a past practice.  Specifically, the Arbitrator concluded that FDR, and not the Union, controlled the process of allowing employees to sign waivers.  That FDR disagrees with the Arbitrator's decision is not a basis to vacate the Final Award.  Neither would this Court's disagreement with the outcome provide a foundation for vacatur.  See WRW Chocolates, LLC v. Moonstruck Chocolatier, Inc., 432 F. Supp. 2d 306, 311 (E.D.N.Y. 2006) ("[A] court has no authority to vacate an award solely because of an alleged error in contract interpretation.  As long as the arbitrator is even arguably

construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision.").

For these reasons, the Arbitrator neither exceeded his authority nor rendered a decision that is "incomplete, ambiguous, or contradictory."  Cf. Bell Aerospace Co. Div. of Textron, Inc. v. Local 516 Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., 500 F.2d 921, 923–24 (2d Cir. 1974) (remanding back to arbitration when "[n]one of the parties ha[d] advanced a clear and compelling interpretation of the award").

Accordingly, the Court declines to vacate the Final Award because the Arbitrator decided the wrong issue.[3]

Because FDR has not met its burden to justify vacatur, the Court declines to vacate the Final Award.  Accordingly, the Final Award is confirmed.  See 9 U.S.C. § 9.

## CONCLUSION

FDR's motion to vacate the Final Award is DENIED.  (Doc. #134).

The Union Defendants' motion to confirm the Final Award is GRANTED.  (Doc. #137).

The third-party complaint is dismissed.

By February 23, 2024, counsel for all parties shall file a joint case management report on the docket of this case ("Laundry I") and on the docket of Trustees of the Laundry, Dry Cleaning Workers and Allied Industries Retirement Fund, Workers United v. FDR Services Corp. of New

---

[3]     FDR briefly argues at the end of its opening brief that the Final Award should be vacated because it does not discuss testimony by three witnesses for FDR, showing the Arbitrator "failed to consider evidence that was germane to the issue." (FDR Mem. at 20).  FDR appears to have abandoned this argument on reply.  In any event, these witnesses were permitted to testify, and are referred to on the cover page of the Final Award, which refutes FDR's argument that the Arbitrator "refus[ed] to hear [this] evidence."  See 9 U.S.C. § 10(a)(3).  Moreover, "[t]he arbitrator's rationale for an award need not be explained."  Ria v. Barclays Cap. Inc., 739 F. Supp. 2d 364, 373 (S.D.N.Y. 2010).

16

<u>York</u>, No. 17-cv-8353 (S.D.N.Y. filed Oct. 30, 2017) ("Laundry II"), not to exceed three pages, setting forth the parties' proposal for how Laundry I and Laundry II should proceed now that the third-party action in Laundry I has been dismissed.

In addition, on March 5, 2024, at 11:30 a.m., the Court will conduct a case management conference in both Laundry I and Laundry II in Courtroom 620 at the White Plains Courthouse to discuss how the two cases should proceed.

The stay of proceedings previously entered in Laundry I and Laundry II is vacated.

The Clerk is directed to terminate the pending motions.  (Docs. ##134, 137).

Dated: February 9, 2024
        White Plains, NY

SO ORDERED:

Vincent L. Briccetti
United States District Judge

17